UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MIKA RAE NELSON, Individually and<br>as Administrator of the Estate of Michael<br>Nelson, Deceased,<br><br>Plaintiff,<br>vs.<br><br>CORRECTIONS CORPORATION OF<br>AMERICA, et al.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 1: 13 CV 2615<br><br><br>JUDGE DONALD C. NUGENT<br><br>MEMORANDUM OPINION |

This matter is before the Court on the Motion of Defendants Corrections Corporation of

America ("CCA") and Warden Goodrich for Summary Judgment. (ECF #53). For the reasons

that follow, the Motion is granted in part.


**FACTUAL BACKGROUND[1]**

This action arises from the death of Michael A. Nelson which occurred on November 24,

2012 while he was incarcerated at the Lake Erie Correctional Institution ("LaECI"), a

medium/minimum security facility in Conneaut, Ohio. LaECI was constructed by the State of

Ohio in 2000 and was initially managed by a private contractor Management & Training

Corporation ("MTC"). On January 1, 2012 CCA took over the operation of LaECI from MTC

and also purchased the facility from the State of Ohio. CCA houses State of Ohio inmates

---

[1] The factual summary is derived from the parties' statements of fact.  Those material facts
which are controverted and supported by deposition testimony, affidavit or other evidence
are stated in the light most favorable to Plaintiff, the non-moving party.

pursuant to a correctional services agreement with the Ohio Department of Rehabilitation and

Corrections ("ODRC"). (Gillespie Aff., ECF#53, Ex. A at ¶4). The ODRC conducted its first

audit of LaECI while under the new ownership and management of CCA on September 18-20,

2012.  Prior to the ODRC audit in September 2012, CCA was running LaECI pursuant to CCA

standards which may stylistically differ from the Ohio standards used in the ODRC audit.

(Goodrich Dep., ECF #59, Ex.5). The  ODRC found 47 standards in non-compliance during the

September 2012 audit. ODRC revisited LaECI on November 7-8, 2012 for a re-inspection.  At

that time ODRC found that 38 of the 47 standards were corrected, 8 standards were found in

pending compliance upon completion of corrective action, and no standards within the facility's

control were found to be non-compliant. Mr. Nelson was incarcerated at LaECI from May 11,

2011 until his death on November 24, 2012.

On November 23, 2012, Mr. Nelson obtained heroin and injected it sometime between

2:00 p.m. and 5:00 p.m. in his cell in Superior C dorm, an honor dorm for inmates who earned

extra privileges by avoiding discipline violations. According to his bunkmate, James Tabor

("Inmate Tabor"), Mr. Nelson used heroin throughout his life and had used it before while

incarcerated at LaECI. (Tabor Statement, ECF #53 Ex. B). On the afternoon of November 23,

2012, another inmate acted as lookout while Mr. Nelson was injecting the heroin.  He was to

alert Mr. Nelson if corrections officers were approaching. (Id.).  After injecting the heroin, Mr.

Nelson concealed the needle in a lotion bottle and laid down on his bunk. (Id.).  Inmate Tabor,

who watched Mr. Nelson inject the heroin, said Mr. Nelson started breathing "kind of heavy and

drooling a little bit" after he laid down.  Inmate Tabor  tried to wake him up but couldn't.   He

wiped Mr. Nelson's mouth and observed that  "[Mr. Nelson] wasn't coherent but he was still

2

breathing kind of raggedy." Inmate Tabor thought Mr. Nelson was alright and in a heavy sleep

because of the heroin. ( Id.). Inmate Tabor thought Mr. Nelson looked alright for the rest of the

day–just laying there sleeping but breathing. While Mr. Nelson's bunkmates were aware of his

use of heroin that day, and they monitored him afterward, they were not concerned about his

condition and did not notify LaECI staff.

At approximately 4:00 p.m. a corrections officer conducted an inmate count of Superior C

dorm, counting the inmates in bed, but not awakening them. (Id.). Assistant Warden Fisher

stated that Mr. Nelson was not disturbed because sleeping inmates generally do not raise

suspicion for corrections officers, as they "are looking for the people causing problems, not

necessarily the guys sleeping." (Fisher Depo, ECF #53, Ex. C at 107-108). At approximately

6:00 p.m., an officer making rounds noted that Mr. Nelson was snoring very loudly. (ECF #53,

Ex.K, Coroner's Verdict). Another officer conducted another formal count between 12:00 a.m.

and 3:30 a.m. on November 24, 2012 and noted that Mr. Nelson was still snoring.[2] Inmate Tabor

said that neither he nor any other inmate ever told a correction officer about Mr. Nelson's use of

heroin. Rather, they let the correction officers making rounds believe that Mr. Nelson was just

sleeping because they did not want Mr. Nelson to get in trouble.

At around 3:45 a.m. when Inmate Tabor got up to use the restroom, he noticed that Mr.

Nelson was no longer snoring and did not seem to be breathing. He put his head on Mr. Nelson's

chest, but did not hear anything. He believed that Mr. Nelson was dead. Another bunkmate,

---

[2]Plaintiff attaches the January 9, 2016, hand written, unsworn statement of James Tabor
as Ex. 10 to her Brief in Opposition to Summary Judgment. In that statement Inmate Tabor
claims that he watched Corrections Officers Arnick and Hoagland fill out their log books without
making rounds. The statement does not say that this happened on the night of November 23,
2012. Mr. Tabor also states that "when Mike was dieing [sic] he was gasping for air not snoring."

Thomas Heaston, also checked Mr. Nelson and observed that "he was cold and stiff"–that he "was chalk white and even in the dark I could see that he was gone." (ECF #53, Ex. D at 39). At that time Inmate Tabor told one of the other inmates to get the corrections officer because Mr. Nelson was not breathing.[3] At approximately 3:46 a.m. an inmate notified Corrections Officer L. Arnick that Mr. Nelson was not breathing. Officer Arnick called out to Corrections Officer A. Hoagland to send a Signal 3 (man down). Officer Hoagland initiated the Signal 3 and corrections officers rushed to help Mr. Nelson. Medical personnel arrived approximately two minutes later, Mr. Nelson was moved to the floor and CPR compressions were started. There apparently was a slight delay in rescue breaths being started as the responding nurse did not have the necessary mouth shield. She quickly obtained the shield and full CPR was continued with an automated external defibrillator ("AED"). Mr. Nelson did not respond. 911 was called at 3:54 a.m. while CPR continued. The ambulance arrived at 4:06 a.m. but Mr. Nelson was still unresponsive. Mr. Nelson was pronounced dead at 4:14 a.m. The Ashtabula Coroner arrived at 5:20 a.m. and took Mr. Nelson's body to the Cuyahoga County Medical Examiner's Office at 7:18 a.m. for an autopsy. While no time of death was determined in this case, Defendants' expert toxicologist Dr. Fochtman stated that he believed Mr. Nelson died between midnight and 1:00 a.m on Saturday, November 24, 2012. (ECF #59, Ex.12). The Ashtabula Coroner determined that Mr. Nelson died from accidental, acute heroin intoxication.

Mr. Nelson's medical records from his time at LaECI reveal that he concealed his history

---

[3]Inmate Tabor states that at some point after he found Mr. Nelson not breathing, he told a corrections officer that Mr. Nelson had used heroin. In one statement Inmate Tabor just says that he told a "CO," in another statement he said he told Assistant Warden Fisher who came on the scene with the Coroner. In any event, the information of the heroin overdose was given too late to matter.

of any drug use, as well as current use from LaECI officials.  Mr. Gillespie, the Health Care

Administrator of LaECI, noted that according to health assessments performed at intake and

transfer in February and May 2011, Mr. Nelson denied any drug use, including opiates and self-

reported on his Health History Form that he did not have a history of "drug use" or

"injection/intranasal drug use." (Gillespie Aff., ECF #53 Ex.A, ¶¶ 9-11). In a June 2011 medical

visit regarding his refusal of lab work and treatment for hepatitis, Mr. Nelson told the provider

that he probably became infected with hepatitis because he was a tattoo artist and refused chronic

care for the disease as "just a waste of time." He again denied any use of "alcohol or street drugs

& all that." (Id. ¶12). Mr. Nelson repeatedly missed physical exams and lab work, and was seen

by medical personnel only based upon his own requests for treatment.  Mr. Nelson was seen for

optometry, an ear infection, and shoulder and back pain. During all of these interactions the

records indicate that Mr. Nelson presented a "clean appearance" and his skin and extremities

were noted as being clean, intact and/or otherwise unremarkable. (Id.).  The medical records

show that medical staff did not know, and had no reason to suspect, that Mr. Nelson may have

been using heroin or other illegal drugs. (Id., ¶ 27.).

Aside from Mr. Nelson, no other inmate had died of a drug overdose since CCA took

over operations at LaECI.  Five other inmates have died during CCA's operation of LaECI

facilities, and all five passed away from natural causes.

At LaECI, corrections officers are required to do rounds approximately every 20 minutes,

resulting in 36 rounds in any given 12 hour period. Although the American Correctional

Association ("ACA") does not require such counts, a formal count in which inmates must stand

or sit upright is also required once every 24 hours at LaECI, but not during night hours. When

taking inmate counts, LaECI policy mandates that corrections officers "be positive [that] they count a living, breathing person" to ensure that the inmate is present. Inmates Tabor and Heaston stated that standing or sitting counts were not performed at LaECI prior to Mr. Nelson's death. The times for inmate counts change daily. Medical staff is on duty 24 hours a day.

## STANDARD OF REVIEW

Summary judgment is appropriate where "the pleadings, discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). "A genuine dispute exists on a material fact, and thus summary judgment is improper, if the evidence shows 'that a reasonable jury could return a verdict for the nonmoving party.' " *Olinger v. Corporation of the President of the Church*, 521 F.Supp.2d 577, 582 (E.D.Ky.2007)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Stated otherwise, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. The moving party has the initial burden of demonstrating the basis for its motion and identifying those parts of the record that establish the absence of a genuine issue of material fact. *Chao v.. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir.2002). The movant may satisfy its burden by showing "that there is an absence of evidence to support the non-moving party's case." *Celotex Corp.*, 477 U.S. at 325. Once the movant has satisfied this burden, the non-moving party must go beyond the pleadings and come forward with specific facts demonstrating the existence of a genuine issue for trial.

6

Fed.R.Civ.P. 56; *Hall Holding,* 285 F.3d at 424 (citing *Celotex,* 477 U.S. at 324). Moreover, "the

nonmoving party must do more than show there is some metaphysical doubt as to the material

fact. It must present significant probative evidence in support of its opposition to the motion for

summary judgment." *Hall Holding,* 285 F.3d at 424 (internal citations omitted).

In applying the summary judgment standard, the Court must review the facts and draw

all reasonable inferences in favor of the non-moving party. *Logan v. Denny's, Inc.,* 259, F.3d 558,

566 (6th Cir.2001)(citing *Liberty Lobby,* 477 U.S. at 255). However, the Court is under no duty

to "search the entire record to establish that it is bereft of a genuine issue of material fact." *In re*

*Morris,* 260 F.3d 654, 655 (6th Cir.2001). Rather, "the nonmoving party has an affirmative duty

to direct the court's attention to those specific portions of the record upon which it seeks to rely to

create a genuine issue of material fact." *Id.*


## DISCUSSION

Plaintiff Mika Rae Nelson, is the deceased's daughter who brings this action individually

and as administrator of the Estate of Michael Nelson against Defendants CCA, Warden Barry

Goodrich and John and Jane Does 1-25 at LaECI[4].  Counts One and Two appear to make the

same claim–violation of civil rights pursuant to 42 U.S.C. § 1983 for deliberate indifference to

exigent medical needs as guaranteed by the Fifth and Eight Amendments to the United States

Constitution and violation of civil rights pursuant to 42 U.S.C. § 1983 for wrongful death as

---

[4]Plaintiff has never identified any of the Doe defendants.  As discovery is closed, and the
Plaintiff has failed to amend her complaint to add any identified Doe defendant, the Court must
conclude that the Plaintiff has abandoned any claim against a Doe defendant.  As such, the Doe
defendants are dismissed.

7

proscribed by the Fifth and Eight Amendments to the United States Constitution. While not precisely clear from the Complaint, Counts Three and Four assert state law claims. Count Three purports to be a claim for Negligent, Willful, Wanton and Reckless conduct. Count Four purports to be a Survival Action for Conscious Pain and Suffering and Intentional Infliction of Emotional Distress.

### I. Section 1983 Claims.

Plaintiff's Section 1983 claims assert that Defendants were deliberately indifferent to Mr. Nelson's medical needs by failing to provide adequate emergency medical treatment knowing that he had overdosed on heroin in violation of the Fifth and Eighth Amendments to the Constitution of the United States.[5] The Eighth Amendment prohibits prison officials from "unnecessarily and wantonly inflicting pain" on prisoners by acting with "deliberate indifference" to prisoners' serious medical needs.[6] *Blackmore v. Kalamazoo County*, 390 F.3d 890, 895 (6th Cir. 2004)(quoting *Estelle v. Gamble,* 429 U.S. 97, 104 (1976) .[7] Thus, the Court must determine

---

[5]Claimants bringing suit under 42 U.S.C. § 1983 must demonstrate that a person acting under color of state law "deprived [him] of rights, privileges or immunities secured by the Constitution or law of the United States." *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005). Defendants do not dispute that they acted under color of state law, so the Court will move on to the issue of whether Defendants violated Mr. Nelson's constitutional rights.

[6]In her brief in opposition to Defendants' motion for summary judgment, Plaintiff's § 1983 claim has morphed into an Eighth Amendment claim of "deliberate indifference to the safety and security" apparently backing away from any claim of failing to provide adequate emergency treatment to Mr. Nelson. However, Plaintiff has never sought leave to amend her complaint.

[7]Plaintiff does not dispute that her claim for deliberate indifference must be analyzed under the 8th Amendment and not the 5th Amendment as the Fifth Amendment applies only to the federal government or its agents. *Hockenberry v. Vill. of Carrollton*, 110 F. Supp. 2d 597, 603 (N.D. Ohio 2000).

whether there is any question of material fact regarding whether Defendants were deliberately indifferent to Mr. Nelson's serious medical needs.[8]

Deliberate indifference claims have both an objective and subjective requirement. *Alspaugh v. McConnell*. 643 F.3d 162, 169 (6th Cir.2011). The objective component requires a plaintiff to prove a "sufficiently serious" medical need. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A "sufficiently serious" medical condition is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention," *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir.2008)(internal quotation marks omitted); *See Santiago v. Ringle*. 734 F.3d 585, 590 (6th Cir. 2013).

The subjective component requires that a prison official (1) "subjectively perceived facts from which to infer substantial risk to the prisoner," (2) "did in fact draw the inference," and (3) "then disregarded that risk." *Santiago*, 734 F.3d at 591 (*citing Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir.2001). (citing *Farmer*. 511 U.S. at 837). Deliberate indifference "entails something more than mere negligence." *Farmer*, 511 U.S. at 833. A Plaintiff must show that prison officials had "a sufficiently culpable state of mind"equivalent to criminal recklessness in denying medical care. *Id.* at 834. Each defendant's conduct must evidence "deliberateness tantamount to an intent to punish." *Hicks v. Frey*. 992 F.2d 1450, 1455 (6th Cir.1993)(quoting *Molton v. City of Cleveland*, 839 F.2d 240, 243 (6th Cir.1988)).

---

[8]This case is unusual in that Plaintiff is not alleging that any individual, either a corrections officer or medical personnel who actually had contact with Mr. Nelson during the time of the overdose and death, actually committed a constitutional violation. Instead, the only named individual defendant is Warden Goodrich who had no involvement in the events surrounding Mr. Nelson's death. Thus, the first part of this opinion analyzes whether any "LaECI official" was deliberately indifferent to Mr. Nelson's serious medical needs in violation of the Eighth Amendment.

Moving first to the objective prong of the deliberative indifference standard, the evidence submitted does not establish the objective culpability. There is no evidence that Mr. Nelson was diagnosed with any kind of addiction prior to his overdose nor does the evidence support any finding that his overdose was so obvious that even a lay person would recognize the need for medical attention. Plaintiff would like the Court to infer that because Mr. Nelson spent 10-12 hours in the late afternoon and evening in his bunk apparently sleeping, it was obvious he was overdosing. Plaintiff suggests that perhaps an official should have recognized that Mr. Nelson was not snoring while sleeping but was actually gasping for air. The only evidence of "gasping" was an unsigned statement from Mr. Nelson's bunkmate made years after the incident (and which contradicts his statement made directly after the incident that Mr. Nelson was merely snoring). Despite Inmate Tabor's late adjustment of his description of Mr. Nelson's "snoring" to "gasping for air," he does not recant his prior statement that he did not think Mr. Nelson was overdosing but was just in a heavy sleep. Thus, the evidence clearly shows that it was not obvious to Mr. Nelson's bunkmates that he was overdosing, even though they knew he was sleeping for 10-12 hours, and snoring or gasping, and they knew he had injected heroin. Therefore, the overdose would likewise not have been obvious to a prison officials who were not in the cell with Mr. Nelson during the relevant time and had no knowledge of his heroin use.

Similarly, the evidence does not establish subjective culpability. There is no evidence that Defendants were subjectively aware of facts from which to infer that a substantial risk of serious harm existed, or that they, in fact, drew that inference. It is undisputed that Mr. Nelson denied any history of drug use in his interactions with prison officials and medical staff and that he blamed his contraction of hepatitis C on his profession as a tattoo artist. There is no dispute

10

that Mr. Nelson successfully hid his use of the heroin that killed him and that his fellow inmates

successfully helped him to conceal that use from prison officials. Once prison officials were

informed of Mr. Nelson's condition they responded quickly and did their best to help him. While

there may have been short delays in providing breathing assistance while providers obtained a

mouth guard and possibly a short delay in getting the AED device to Mr. Nelson, these delays

were not deliberate or extended. At most Plaintiff may be able to suggest negligence, but not

"criminal recklessness in denying medical care."*Farmer,* 511 U.S. at 834. In any event, no one

disputes that Mr. Nelson was already dead when prison officials were called.

Plaintiff argues that Defendants were "willfully blind" to the circumstances leading up to

Mr. Nelson's overdose and that willful blindness constitutes objective and subjective culpability.

Specifically Plaintiff argues that Defendants willfully failed to perform rounds as well as

standing counts, falsified log books and knew that there were drugs, including heroin in the

facility. Moreover, Plaintiff argues that Defendants were willfully blind to the serious risk that

Mr. Nelson could be slowly dying of a drug overdose because he was at a high risk from drug

abuse. Plaintiff draws this conclusion from the fact that Mr. Nelson had hepatitis C which is

often, but not always contracted through intravenous drug use. While Plaintiff does not assert

that Defendants had actual knowledge of Mr. Nelson's prior use of heroin or of his use of heroin

on the day he died, she apparently believes that Defendants willfully refused to evaluate Mr.

Nelson's risk factors for drug use and possible overdose.

However, Plaintiff's "willful blindness" standard conflicts with the actual knowledge of

excessive risk of harm standard established by the Supreme Court in *Farmer*. Plaintiff relies on

a First Circuit case decided prior to *Farmer* for the willful blindness standard. *See Bowen v.*

*City of Manchester*, 966 F.2d 13 (1st Cir. 1992)(evidence must show that official had actual knowledge of, or was willfully blind to, the serious risk of suicide.). *Farmer* made clear that a prison official cannot be found liable under the Eighth Amendment unless the "official knows of and disregards an excessive risk to inmate health or safety: the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *Farmer*, 511 U.S. at 837-38. If an official fails to act in the face of an obvious risk of which he should have known but did not, the official has not violated the Eighth Amendment. *Id.*

There is no evidence that any official at LaECI, including the only named individual defendant, Warden Goodrich, knew either of Mr. Nelson's history of drug use or his use of the heroin that led to his death. Further, there is no evidence that any official observed any sign that Mr. Nelson was experiencing an overdose. Moreover, even if sleeping and snoring or gasping while sleeping for 10-12 hours in the late afternoon through the night should have been interpreted as an obvious sign of overdose, there is no evidence that any LaECI official drew that inference. The Sixth Circuit has repeatedly found that officers are not liable for deliberate indifference to an inmate who died in their custody from a drug overdose where they had no actual knowledge of the overdose. *See Weaver v. Shadoan*, 340 F.3d 398, 410-11 (6th Cir. 2003)(pretrial detainee overdose death finding no deliberate indifference under 8th or 14th Amendment); *Watkins v. City of Battle Creek*, 273 F.3d 682, 685-86 (6th Cir. 2001)(summary judgment for defendants in overdose death--it is not enough for plaintiff to demonstrate a question of fact whether the police officers or sheriff's deputies *should have* known that Watkins had swallowed drugs.); *Smith v. Pike County*, 338 Fed. App'x. 482 (6th Cir. 2009); *Estate of*

*Goodin v. Knox County*, 2014 WL 2719816, *2-3 (E.D. Ky. June 16, 2014)[9].  Further, even if the

Court would adopt Plaintiff's willful blindness standard, the record does not support Plaintiff's

position that circumstances clearly indicated Mr. Nelson was at serious risk of overdose.

Based upon the record before the Court, no rational trier of fact could conclude that

Plaintiff could establish both objective and subjective culpability as required to recover under a

deliberative indifference claim under the Eighth Amendment. Simply stated there is insufficient

evidence to establish an Eighth Amendment violation by any LaECI official.

**A. Supervisor Liability**

It is well settled that Section 1983 liability cannot be imposed under a theory of

respondeat superior. *Kentucky v. Graham,* 473 U.S. 159, 166 (1985)(a government official can

only be personally liable for a § 1983 claim if he personally "caused the deprivation of a federal

right."). Otherwise stated, "[b]ecause § 1983 liability cannot be imposed under a theory of

*respondeat superior,* proof of personal involvement is required for a supervisor to incur personal

liability ." *Miller v. Calhoun Cnty.,* 408 F.3d 803, 817 n. 3 (6th Cir.2005)(citing *Taylor v. Mich.*

*Dept. of Corr.,* 69 F.3d 76, 80–81 (6th Cir.1995)).

There is no evidence that connects Warden Goodrich to the events surrounding Mr.

Nelson's overdose and death.  Indeed the Warden was traveling when the incident occurred and

was not at the prison. It is clear that Warden Goodrich had no personal involvement in the

---

[9]Plaintiff's attempt to discount the pretrial detainee overdose cases on the grounds that the Eighth Amendment does not apply to pretrial detainees is unavailing.  The Sixth Circuit has explained that while the Eighth Amendment does not apply to pretrial detainees, pretrial detainees have a right to adequate medical treatment under the Fourteenth Amendment that is analogous to the Eighth Amendment rights of prisoners and courts will apply the same "deliberative indifference" standard in both situations. *Watkins,* 273 F.3d at 685-86.

incident and could not have personally caused Mr. Nelson to be deprived of a federal right. Further, in this case, the Court has determined that Mr. Nelson was not, in fact, deprived of his Eighth Amendment rights.

Plaintiff hopes to avoid the bar against respondeat superior liability based on her theory that Warden Goodrich is liable under the doctrine of supervisory liability for his alleged willful failure to comply with his duties under the Eighth Amendment. Plaintiff points to two Sixth Circuit decisions finding supervisory liability for prison officials who failed to perform their specific duties.

In *Hill v. Marshall*, 962 F.2d 1209 (6th Cir. 1992), the plaintiff inmate brought an Eighth Amendment claim against defendant, the deputy superintendent of treatment at the institution where he was imprisoned. His claim was based on a failure to receive his prescription medication in the "pill line" even after he had sent complaints to defendant and the infirmary administrator. The court found that the plaintiff did not seek to hold defendant vicariously liable for the head nurse's misconduct, but rather for his own conduct in ignoring plaintiff's complaint and referring the inmate complaints to the head nurse who he knew was wrongly altering and destroying some of the inmate's prescriptions. The court determined that defendant's failure to do his own job resulted directly in a violation of the plaintiff's Eighth Amendment right.

In *Taylor v. Michigan Dep't of Corrections*, 69 F.3d 76, 80 (6th Cir. 1995), a small, mildly retarded inmate was raped after being transferred to a different facility which placed him in a much higher danger of rape. Summary judgment was denied to the defendant warden, based on the reasoning in *Hill*. Specifically, the court found that it was the defendant's actual performance of his job function (approving inmate transfers despite knowing that inmate files were not

14

reviewed prior to transfers) that resulted in a direct injury to the plaintiff.

The Sixth Circuit later explained that in both *Hill* and *Taylor* "it was the defendant supervisors' active engagement in a function of their position that directly resulted in injury to the plaintiffs. . . . This sort of "direct participation" or, at the very least, active acquiescence in the known misconduct are likely examples of the outer bounds of the "active performance" necessary for a supervisory liability claim. *See Gregory,* 444 F.3d at 752. "[L]iability must lie upon more than a mere right to control employees and cannot rely on simple negligence." *Id.* at 751. There must be some conduct on the supervisor's part to which a plaintiff can point that is directly correlated with the plaintiff's injury. *See id.* at 752." *Essex v. Cty. of Livingston*, 518 F. App'x 351, 355 (6th Cir. 2013).

Plaintiff asserts that Warden Goodrich abandoned the duties of his position by failing to follow ODRC regulations, failing to adopt reasonable procedures to minimize the introduction of contraband into the prison, failing to ensure corrections officers were performing their rounds, and failing to ensure that formal standing counts were being performed. Plaintiff asserts that Mr. Goodrich knew of these failures and the policy violations occurring at LaECI because they had been cited in audit findings. While Plaintiff alleges that Warden Goodrich abandoned his duties, the evidence does not support the assertion. While the first ODRC audit found 47 policy violations, the follow up audit done 2 weeks prior to Mr. Nelson's death congratulated Warden Goodrich for the many accomplishments achieved in such a short amount of time resulting in the correction or pending correction of all standards. (ECF #59, Ex. 7). Similarly, the ACA audit of the facility conducted on December 4-6, 2012 resulted in the facility scoring 100 percent compliant for mandatory standards and 99.07 percent compliant on non-mandatory standards.

15

Finally, although the Correctional Institution Inspection Committee Report following a January 22-23, 2013 inspection "raised a number of significant concerns" the report also stated that "staff have relayed that they have already instituted additional security measures to control contraband and that they are in the process of implementing a stratification plan that will improve the overall facility environment and violence levels. Following the inspection, LaECI staff were very responsive to CIIC's concerns. Staff promptly developed extensive action plans and engaged in several follow-up discussions with CIIC regarding the identified issues." (ECF #59, Ex.6 at 2). Clearly, this does not show that Warden Goodrich abandoned his duties or "acquiesced in known misconduct."

In addition, there is no evidence that any alleged "abandonment" directly correlated with Mr. Nelson's injury. Plaintiff's death was not caused by anything Warden Goodrich actually did, in his professional or personal capacity, as would be required for "active performance" supervisory liability claim under *Hill* and *Taylor*. Rather, the claims only assert that Warden Goodrich is generally responsible for the conditions within the prison because he supervised the enforcement of prison rules. Supervisor liability under §1983 cannot attach where the "allegation of liability is based on a mere failure to act." *Stewart v. Taft*, 235 F.Supp. 2d 763 (N.D. Ohio 2002). In *Stewart* the Court rejected Plaintiff's argument that he was not attempting to hold supervisory defendants liable under the doctrine of *respondeat superior*. Plaintiff argued that because the Governor and two state prison officials had knowledge of unconstitutional prison overcrowding which allegedly caused Plaintiff to contract a disease, and did not correct the problem and in fact directly allowed conditions to deteriorate, defendants were liable under § 1983 because they directly participated in depriving Plaintiff of his Constitutional rights.

16

Unlike the supervisors in *Hill* or *Taylor*, there is no evidence that Warden Goodrich actually knew of any substantial risk of inmates fatally overdosing on heroin or any other drug as a result of any prison policy. Plaintiff argues that because there were illegal drugs in the facility, the Warden should have known Mr. Nelson was at risk for overdose. However, the facility had never had a death from an overdose, or any other unnatural causes, despite the availability of drugs in the facility. Mr. Nelson was the first overdose death at LaECI. Moreover, even if there was a serious risk of overdose for a certain group of inmates, there is insufficient evidence for the correction officers to infer that Mr. Nelson would have been a member of that group given his history of denying and concealing drug use. None of the alleged failures to act implicate a specific act that Warden Goodrich was required to perform. Unlike *Taylor*, Plaintiff list of alleged "failures to act" does not allege an affirmative act which directly caused Mr. Nelson's death, but mere failure to do more to prevent it. The Warden's general responsibilities as supervisor are insufficient to impart liability under section 1983. *Stewart,* 235 F.Supp.2d at 767.

### B. § 1983 Claim against CCA

Plaintiff alleges that CCA is liable for an Eighth Amendment violation caused by its policies and customs. In *Monell,* the Supreme Court explained that municipal liability under section 1983 may only attach where the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury" complained of. Thus, a plaintiff must prove two basic elements: (1) that a constitutional violation occurred; and, (2) that the County "is responsible for that violation." *Graham ex rel. Estate of Graham v. Cty. of Washtenaw*, 358 F.3d 377, 382 (6th Cir. 2004)(citing *Doe v. Claiborne Cty.,* 103 F.3d 495, 505–06 (6th Cir.1996)).

17

A private corporation that performs the traditional state function of operating a prison acts under color of state law for the purposes of § 1983. *See Street v. Corr. Corp. Of Am.*, 102 F.3d 810, 814 (6th Cir. 2005). Like a municipality, a government contractor cannot be held liable on a *respondeat superior* theory. *Id. at* 818. The difference, however, is that a private contractor is liable for a policy or custom *of that private contractor*, rather than a policy or custom of the municipality. *Johnson v. Karnes*, 398 F.3d 868, 877 (6th Cir. 2005); *See Hicks*, 992 F.2d at 1458; *Street*, 102 F.3d at 817.

Plaintiff asserts that CCA had a custom and practice, if not an unwritten policy, (1) of not performing rounds as required; (2) of not having supervisors verify that the rounds were performed; (3) of falsifying log books; (4) of not perform standing counts; and, (5) of failing to properly train employees regarding what regulations to follow (CCA's or Ohio') which persisted even after Mr. Nelson died. Plaintiff claims that all of these customs and practices directly led to the death of Mr. Nelson.[10]

Plaintiff does not assert or submit evidence that these five practices are "official enactments" of CCA policy made by someone with final decision-making authority. She call it an "unwritten policy." Thus, she must prove that there was an unofficial policy or custom rising to the level of a custom or usage with the force of law. A plaintiff may be able to prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is "so permanent and well settled as to constitute a 'custom or usage' with the

---

[10]While the Court is addressing the other arguments made by the parties with respect to *Monell* liability, as noted in previous sections, no evidence in this record supports a finding that one or more of the alleged customs identified here by Plaintiff caused or even led to Mr. Nelson's death. As such CCA is not liable under a *Monell* theory for a Constitutional violation.

18

force of law." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)*(citation omitted). The* record does not support Plaintiff's claim that these "unwritten policies" are permanent and well settled. There is no evidence to establish a pattern of similar violations over time from which a jury might reasonably infer that the alleged failures were more than isolated events or that they were so 'persistent and widespread' so as to constitute official policies of CCA. *See Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985)("proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*. . . ").

The only evidence Plaintiff submits to argue the that these failures were widespread and persistent is the ODRC audit report. However, as noted in the previous section, most of the violations noted in the September 2012 audit were corrected before Mr. Nelson's death. Moreover, the violations noted in the audits do not necessarily include all of the practices asserted by Plaintiff. In any event, a record of violations of ODRC policy, which have since been corrected, does not establish a well settled practice or custom of CCA, much less deliberate indifference.

Further, Plaintiff presumes, without evidentiary support, that these alleged unofficial policies were the cause of Mr. Nelson's death. There is no evidence in the record to show that many of these alleged policy failures occurred on November 22 and 23, 2012. Although there are statements from the two inmates saying that they saw guards falsifying log books in general, no one has testified that this occurred on the night of the Mr. Nelson's death. Further, from the statements of the inmates it appears that corrections officers did make rounds during the night in question and that Mr. Nelson's bunkmates chose not to draw attention to Mr. Nelson. While it appears that no standing count was performed during the hours following Mr. Nelson's ingestion

19

of heroin, the official policy in place at the time called for one standing count every 24 hours, but not at night. According to the estimated time of death, Mr. Nelson died well into the nighttime hours. Finally, there is no evidence that CCA regulations differed from Ohio regulations in any way that would affect inmate safety. The only testimony on this issue came from Warden Goodrich who stated that the differences between CCA and state regulations were essentially stylistic. He also testified that CCA personnel were instructed to follow Ohio regulations following the September 2012 audit. As such the evidence does not support any finding that CCA policy or custom was the "moving force" behind any harm suffered by Mr. Nelson. *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 379 (1989)[11].

Based upon the applicable law and the evidence submitted, there remain no questions of material fact with regard to Defendants' liability under §1983. Therefore, Defendant is entitled to summary judgment and Plaintiffs'§1983 claims are, hereby dismissed with prejudice.


## II. State Law Claims

Because Plaintiff's federal claims have been dismissed, the only remaining claims are state law claims. It is generally recognized that where, as in this case, federal issues are dismissed before trial, district courts should decline to exercise pendent, or supplemental, jurisdiction over state law claims. *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Taylor v. First America Bank-Waynd. 973 F.2d 1284. 1289* (6th Cir.

---

[11]Defendants included an argument that there was insufficient evidence to support a failure to train medical staff theory. Plaintiff does not suggest such a theory in her brief in opposition to summary judgment on her § 1983 claims. If such a theory had been asserted in the § 1983 claims, it would fail for the reasons set forth by Defendants in their reply brief. The Court does not reach the question of whether this theory was sufficiently alleged as a state law claim.

1992); *Gaff v. Federal Deposit Ins. Corp.*, 814 F.2d 311, 319 (1987)(after dismissing all federal claims, it was error for the district court to have retained jurisdiction over the purported state law claims for the purpose of dismissing them with prejudice); *Burt v. Blue Shield*, 591 F.Supp. 755, 759 (S.D.Ohio 1984). In keeping with these precedents, the Court declines to assert supplemental jurisdiction over Plaintiff's remaining state law claims and those claims are dismissed without prejudice.

## CONCLUSION

For the reasons set forth above, the Court hereby GRANTS Defendants' Motion for Summary Judgment (ECF #53) as to Plaintiff's § 1983 claims. The Court declines to accept supplemental jurisdiction over the remaining State law claims and those claims are dismissed without prejudice. This action is terminated. All other outstanding motions shall be termed.

IT IS SO ORDERED.

DONALD C. NUGENT
UNITED STATES DISTRICT COURT

DATED: March 14, 2016

21